Deborah BRYANT, Plaintiff,

v.

CARITAS NORWOOD HOSPITAL,
Defendant.

No. CIV.A. 03–12056–DPW.

United States District Court,
D. Massachusetts.

Nov. 24, 2004.

David R. Ardito, Law Office of David R. Ardito, Attleboro, MA, for Plaintiff.

Anthony D. Rizzotti, Ropes & Gray LLP, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

WOODLOCK, District Judge.

Plaintiff Deborah Bryant ("Bryant") brings this action against her former employer, defendant Caritas Norwood Hospi-

tal ("Caritas"), alleging discrimination in violation of the Americans with Disabilities Act ("ADA") and seeking declaratory and monetary relief based on the alleged failure of Caritas to provide her with a reasonable accommodation such that she could continue in her employment as a nurse despite her alleged disability. Caritas moves for summary judgment.

## I. OVERVIEW

### A. Factual Background

Bryant was hired as a Staff Nurse in the Ambulatory Surgery ("Day Surgery") department of Caritas in or about November 1989. The duties of a Day Surgery Staff Nurse include pushing and pulling stretchers, lifting patients, adjusting patients in post-operative recliners, transporting patients' belongings, positioning patients on stretchers after they have been anesthetized, and bending to retrieve supplies. In emergency situations, a Staff Nurse also would be expected to engage in heavy lifting—for example, catching a patient who had become faint and was falling down or moving such a patient post-fall. Until 2001, Bryant was able to perform her job duties satisfactorily.

In January 2001, Bryant sought medical attention from Dr. George Frangieh, an ophthalmologist at Caritas, because she had started to experience blurred vision. On January 18, 2001, Dr. Frangieh diagnosed Bryant with central serous retinopathy. At the time of this diagnosis, Bryant was given no medical restrictions regarding the work she could engage in and she returned to her position as a Staff Nurse in the Day Surgery department. On February 26, 2001, Bryant noticed that her vision became more blurred after she attempted to move a patient's heavy belongings while at work. Bryant returned to Dr. Frangieh for further assistance and was informed by him that she had a hem-

orrhage (i.e., bleeding) in her left eye. Bryant then consulted with Dr. George Sharuk, who diagnosed her with choroidal neovascularization—the formation of abnormal blood vessels in the eye that are prone to breaking and leaking—incident to ocular histoplasmosis. On February 28, 2001, Dr. Sharuk performed laser eye surgery on the hemorrhage in Bryant's left eye, which stopped the bleeding in that eye but did not resolve the underlying condition. Dr. Sharuk advised Bryant not to engage in activities that could aggravate her condition, such as sneezing and coughing (termed "valsalva activities"), heavy lifting, straining, bending such that her head was below heart level, and taking aspirin or other anticoagulants.

Following her surgery, Bryant requested a medical leave of absence from work and in conjunction with this request submitted a letter to Caritas from Dr. Sharuk that spelled out the activities she was advised to avoid so as to prevent additional hemorrhaging in her eyes. Caritas granted Bryant twelve weeks of medical leave. The leave commenced on March 5, 2001. On May 21, 2001, Bryant went to Caritas to discuss her return to work and met with her direct supervisor, Cynthia Sotrel; her requested union representative, nurse Mary Burgoyne; and the Director of Surgical Services at Caritas, Dolores Vieira. During the meeting the attendees discussed the medical limitations Bryant was operating under due to her eye condition and also how Caritas could accommodate those limitations. In particular, Bryant indicated that she would not be able to perform heavy lifting on her own and suggested that she be reassigned to a Scrub Nurse position in the Ophthalmic Surgery department, which would not require this type of exertion. By the end of the meeting, the parties had not reached a final decision about how Bryant's job duties

would be modified, if at all, when she returned to work at the conclusion of her medical leave.

During a follow-up appointment with Dr. Sharuk on May 23, 2001, Bryant asked her physician to draft a "return to work" letter she could provide to Caritas. Dr. Sharuk agreed to do so. Bryant received his letter, which was dated June 6, 2001, on June 12, 2001. In his June 6, 2001 letter, Dr. Sharuk reiterated the activities Bryant was to avoid so as not to cause additional hemorrhaging in her eye: straining, heavy lifting, bending so her head was below heart level, sneezing and coughing, and taking aspirin or other anticoagulants.

On May 28, 2001, Vieira and Sotrel called Bryant at home to continue the discussion about her return to work. During this conversation, the two Caritas representatives asked Bryant whether her preference was to return to her prior position as a Staff Nurse in Day Surgery or to transfer to Ophthalmic Surgery where she could work as a Scrub Nurse. Bryant responded that she would rather return to her prior position. As had the May 21, 2001 meeting, this conversation came to an end without a final determination being made regarding the circumstances of Bryant's return to work.

On June 12, 2001, after receiving the "return to work" letter from Dr. Sharuk in the mail, Bryant called Sotrel to inquire about the details (time, date, etc.) of her returning to work. Sotrel told Bryant that she could come back to Caritas whenever she wished. Bryant reported for work in Day Surgery at 5:30 a.m. the next day, June 13, 2001, and provided Sotrel with a copy of Dr. Sharuk's "return to work" letter. Over the course of the day, Bryant attended two meetings with Cathy Merrigan, the Caritas employee health nurse, whose responsibilities included determining whether Caritas is "capable of providing its employees with a safe working environment." Bryant provided Merrigan with a copy of the "return to work" letter from Dr. Sharuk at the first of these meetings. In the second meeting, which was also attended by Vieira and Sotrel, Merrigan informed Bryant that Caritas could not provide her with a safe working environment given her medical limitations and, therefore, that she could not continue working as a Staff Nurse in Day Surgery and was to leave the building. According to Caritas, the possibility of Bryant transferring to a Scrub Nurse position was discussed once again during the second meeting, but Bryant "indicated an unwillingness to accept that position."

Vieira called Bryant the next day, June 14, 2001, to ask her to attend a meeting at Caritas on June 15, 2001 regarding her employment at the hospital. Bryant agreed and asked Cathy Laramee, a fellow nurse, to be her union representative at the meeting. In addition to Bryant, Laramee, and Vieira, the June 15, 2001 meeting was also attended by Sotrel and Merrigan. During the meeting, the parties discussed not only the possibility of Bryant returning to Caritas as a Scrub Nurse in Ophthalmic Surgery rather than as a Staff Nurse in Day Surgery, but also a proposal from Bryant that she resume her position in Day Surgery but with certain accommodations in place. In particular, Bryant requested that she be permitted to not engage in any heavy lifting on her own and, instead, to have other nurses assist her with any such lifting that was necessary. Vieira responded that Caritas could not agree to the proposed accommodation because it considered heavy lifting one of a Staff Nurse's essential duties. Bryant was told that if there were fewer restrictions on her activities in the future Caritas would reevaluate whether it could provide her with a "safe working environment,"

but that, at present, because she could not perform the "essential duties" of a Staff Nurse in Day Surgery due to her medical restrictions, she could not return to that job. Following this meeting, Caritas placed Bryant on continued leave of absence.

On June 15, 2001 Bryant wrote to Dr. Frangieh—the Caritas physician who had initially diagnosed and treated her eye condition—seeking a letter from him stating that she could return to work so long as she avoided heavy lifting. Dr. Frangieh responded that Bryant instead should contact Dr. Sharuk, the physician who had treated her eye condition most recently, which she did.

On June 25, 2001, Bryant filed a complaint against Caritas with the Massachusetts Commission Against Discrimination ("MCAD") alleging that Caritas had discriminated against her on the basis of her disability (i.e., her choroidal neovascularization) by failing to provide her with a reasonable accommodation for the disability (i.e., allowing her to resume her employment as a Staff Nurse while excusing her from any heavy lifting duties attendant to the same). In her MCAD filing, Bryant made a demand that she be restored to the Staff Nurse position with the requested accommodation in place.

Thereafter, Daniel Michaud, the Vice President for Human Resources at Caritas, sent Bryant a letter dated August 29, 2001 in which he offered Bryant the Scrub Nurse position in Ophthalmic Surgery at the same pay and benefits she had enjoyed while working as a Staff Nurse in Day Surgery. The offer was contingent upon Bryant providing documentation from her physician that she was able and cleared to perform the essential functions of the Scrub Nurse position, with or without reasonable accommodation, was otherwise unconditional, and was to remain open for ten days after the date of the letter. Michaud noted in his letter that Caritas had twice previously sent a description of the Scrub Nurse position to Bryant's physician seeking a determination as to whether she could perform the essential functions of the job with or without reasonable accommodation but had received no response to either inquiry. Bryant received Michaud's letter on August 31, 2001—which was within the ten day window during which the offer was open—but rejected the offer. During her deposition Bryant explained that she had rejected the job offer because she did not think it was a "true" one; Bryant did not confront Caritas about her suspicion at the time the offer was made.

Pursuant to Bryant's earlier request, Dr. Sharuk sent a letter to Caritas dated September 25, 2001 in which he opined that she "can do her job as R.N." and that his only ongoing "concern" was her performing heavy lifting, thereby endorsing only this one restriction from his prior longer list that had also included valsalva-stimulating motions, bending, straining, etc. Bryant's attorney sent a copy of this letter to the attorney for Caritas on November 5, 2001, accompanied by a cover letter stating that Bryant was "ready, willing, and able to return to work." Caritas, through counsel, responded in a letter dated November 27, 2001, in which it asked for clarification regarding Dr. Sharuk's letter—in particular, whether the "concern" he had expressed regarding Bryant engaging in heavy lifting was, in fact, a medical restriction on her performing such activity—and also reiterated its offer to Bryant of the Scrub Nurse position. Furthermore, the letter from Caritas noted that if Bryant accepted the Scrub Nurse position and was subsequently "cleared" by her physician to return to her prior Staff Nurse position—translating, presumably, as an affirmative statement by her physi-

cian lifting the restriction on heavy lifting and imposing no other restrictions in the meantime—Caritas would reinstate her in her prior job. Caritas received no response to this letter from Bryant, her counsel, or anyone acting on her behalf.

The extended leave Caritas granted Bryant in June 2001 expired on March 8, 2002. By letter dated March 24, 2002, Caritas informed Bryant that "due to the extended and indefinite nature" of her medical condition, her employment status as a Staff Nurse in the Day Surgery department would change from "extended industrial medical leave to terminated status."

In her deposition, Bryant admitted that while on extended medical leave from Caritas between June 2001 and November 2001, she engaged in "all of [her] normal activities of daily living" save for "heavy housework"—which she defined as vacuuming, moving furniture, and washing floors. In addition to caring for herself and engaging in the "normal activities of daily living," in November 2001 Bryant began assisting a friend care for her newly adopted son, who is now age four. In this regard, Bryant started spending ten to twenty hours per week serving as the primary care-taker for the young child—cooking for him, playing with him, etc.—while her friend was away from the house. To spend time with the child, Bryant would drive to her friend's house in Rehoboth, Massachusetts.

Bryant assumed additional care-taking duties after her grandmother suffered a stroke in November 2003. Bryant moved into her grandmother's home on Cape Cod in January 2004 and, at that time, began serving as her grandmother's primary care-taker. In the course of this aid, Bryant cooks for her grandmother, bathes her, helps her to descend the stairs, dispenses her medications, changes her bed-

ding, and runs errands for her. At the time of her April 2004 deposition, Bryant was dividing her time between caring for her grandmother on Cape Cod and for her friend's son in Rehoboth.

Bryant conceded during her deposition that since June 2001, when her extended medical leave from Caritas resumed, and the date of her deposition, April 20, 2004, she had not been seeking employment actively. Although arguing that she would need to be retrained if she took a new position, Bryant did acknowledge that it was not the case that there were no available nursing positions in Massachusetts that she might have been qualified for and applied for during this period. In other words, Bryant conceded that there were open nursing positions during this period that she might have been qualified for, but for which she never applied.

When asked about the current impact of her alleged disability on her physical activities, Bryant testified that she had difficulty only with heavy lifting and driving at night. Regarding her present employment potential, Bryant testified that she thought she was physically capable of working as a nurse in two of the three divisions comprising the Day Surgery department at Caritas—the minor rooms and the admitting room—but not in the third division, the recovery room, due to a concern about having to engage in heavy lifting while working therein.

**B. Procedural History**

The MCAD dismissed Bryant's discrimination complaint on June 3, 2003. On September 18, 2003, Bryan commenced the present action in the Bristol County Superior Court. Caritas removed the case to federal court on October 24, 2003. Following discovery, Caritas moved for summary judgment on September 30, 2004. On November 12, 2004, Bryant filed a written

opposition to the motion for summary judgement. Bryant did not submit additional affidavits with this memorandum, as would have been allowed by Fed.R.Civ.P. 56(e). I heard argument on November 23, 2004.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material". if it has the "potential to affect the outcome of the suit under the applicable law," *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000), and a " 'genuine' issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (quoting *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir.1996)).

A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Once the movant has made such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trialworthy issue. *Id.* A genuine dispute of material fact cannot be established through "conclusory allegations, improbable inferences, and unsupported speculation" alone. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). The nonmovant "may not rest upon the mere allegations or denials of the [moving] party's pleading," and instead "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Additionally, if the nonmovant fails to make "a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), summary judgment must enter against it. *Id.* at 323, 106 S.Ct. 2548. With respect to the nonmovant's burden of proof in establishing the essential elements of its case, the resolution of a motion for summary judgment "implicates the substantive evidentiary standard of proof that would apply at a trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Bearing these precepts in mind, I now turn to the merits of the summary judgment motion, considering first whether Bryant is entitled to the protections of the ADA and then whether Caritas has failed to reasonably accommodate her disability.

### B. ADA Analysis.

Among the purposes underlying the enactment of the Americans with Disabilities Act ("ADA"), Pub. Law No. 101–336, 104 Stat. 327 (1990) (codified at 42 U.S.C. §§ 12101–12117 (Supp.2004)), was a desire by Congress to provide people with mental and physical disabilities a meaningful opportunity to participate in the employment marketplace by "remov[ing] barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." 29 C.F.R. Pt. 1630, App. (Interpretive Guidance on Title I of the Americans with Disabilities Act, promulgated by the Equal Employment Opportunity Commission ("EEOC")) (2004). In order to achieve this valuable end, the

ADA mandates that "[n]o covered entity"—which Caritas does not contest it is, as a private employer—"shall discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). The ADA defines "discrimination" to encompass "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *Id.* at § 12112(b)(5)(A). Thus, for Bryant to prevail on her claim that Caritas discriminated against her in violation of the ADA by failing to reasonably accommodate her disability, first she must establish that she is entitled to the protections of the ADA—*i.e.*, that she is an "otherwise qualified individual" with a "disability," as those terms are defined in the ADA—and then she must prove that Caritas violated the ADA by failing to provide her with a reasonable accommodation, including by rebutting any argument by Caritas that the accommodation would result in "an undue hardship." I will consider these issues of statutory entitlement and statutory violation—both of which are essential elements of Bryant's case and for which, in order to survive the motion for summary judgment, she must provide sufficient proof to establish them by a preponderance of the evidence—in turn.

### 1. *Entitlement to Statutory Protection*

As noted above, it is unlawful under the ADA for covered entities to discriminate against an "otherwise qualified individual with a disability." 42 U.S.C. § 12112(a). With respect to an individual person, the ADA defines "disability" as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being

regarded as having such an impairment." 42 U.S.C. § 12102(2). Furthermore, a "qualified individual with a disability" is defined as:

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential.

42 U.S.C. § 12111(8). Bryant has failed to demonstrate either that she is "disabled" or a "qualified individual with a disability" within the meaning of the ADA.

a. *"Disabled"*—Given the definition of "disability" contained in the ADA, an individual can establish that she is disabled within the meaning of the statute by proving that: (1) she has "a physical or mental impairment that substantially limits one or more of the major life activities" she engages in; (2) she has a "record of such an impairment"; *or* (3) she is "regarded as having such an impairment." 42 U.S.C. § 12102(2). Bryant makes no reference to having a "record of [a physical or mental] impairment" or to being "regarded as having such an impairment" in her complaint, but does reference her medical condition and the restrictions placed on her activities related to this condition. It is apparent, then, that she bases her claim of having a qualifying "disability" under the ADA on the first prong of the definition. For purposes of this analysis, therefore, that is the definition that will be considered.

██ Pursuant to the case law interpreting the ADA, it is common ground that "[n]ot all physical impairments rise to the level of disability under the ADA." *Lebron–Torres v. Whitehall Laboratories,* 251 F.3d 236, 239 (1st Cir.2001) (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S.

555, 565–66, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)). Furthermore, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). In order to recover under the ADA, then, claimants need to establish that they have a qualifying impairment and they "also need to demonstrate that the impairment limits a major life activity." *Id.* (citing 42 U.S.C. § 12102(2)(A)).

■ In *Toyota,* the Supreme Court set forth the standard Bryant must meet to satisfy the first of the three possible definitions of "disability" under the ADA:

[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term.

*Id.* at 198, 122 S.Ct. 681. Because Congress intended the "existence of a disability to be determined in … a case-by-case manner," *Toyota,* 534 U.S. at 198, 122 S.Ct. 681, the evidence adduced by Bryant in making this showing must be individualized. Claimants such as Bryant, seeking the protection of the ADA, are required "to prove a disability by offering evidence that the extent of the limitation in terms of their own experience … is substantial." *Albertson's,* 527 U.S. at 567, 119 S.Ct. 2162.

■ Bryant has failed to adduce sufficient evidence to establish she is disabled within the meaning of the ADA by having a physical impairment that substantially limits her ability to engage in major life activities. Instead, the record evidence demonstrates that during the course of her medical leave from Caritas, Bryant resumed all of her "normal activities of daily living" save for heavy lifting, that the only activities she presently has difficulty with are heavy lifting and nighttime driving, and that she was, in her attorney's words, "ready, willing, and able to return to work" within ten months of the onset of her eye condition. Due to their nature and duration, the limitations Bryant has experienced on account of her eye condition do not an ADA-qualifying disability make.

When Bryant first went on medical leave in March 2001, her physician, Dr. Sharuk, instructed that "[a]ctivities that can cause increased risk of bleeding from the new vessels should be avoided. These activities include heavy lifting, staining, valsalva type activities (such as sneezing and coughing), and bending so that the head comes below the heart level." Less than eight months later, Dr. Sharuk advised with respect to Bryant's desired return to work that "[t]he only concern is heavy lifting and only if neovascularization recurs and there are no signs of that at the present time." Bryant herself testified that during her medical leave from Caritas she resumed all "normal activities of daily living" except for "heavy housework," which she defined to include vacuuming, bending over to clean floors, and moving furniture. The time-limited nature of the limitations initially placed on Bryant by her physician preclude a finding that they resulted in her being "substantially limited in major life activities." As noted above, Bryant must show that the impact of her alleged impairment was "permanent or long term." *Toyota,* 534 U.S. at 198, 122 S.Ct. 681. Bryant has failed to make such a showing and, instead, has admitted that she had resumed "normal activities of daily living" by between June 2001 and November 2001, just three to eight months after she first went out on medical leave. *See Carroll v. Xerox Corp.,* 294 F.3d 231, 240–41 (1st Cir.2002) (finding that employee

who went on three-month leave from work for psychiatric problem, and offered no evidence of "medical restrictions or other limitations" on his ability to work thereafter, had failed to "produce evidence that his condition was of sufficient duration and severity to substantially limit him in working" and therefore could not be found disabled under the ADA); *McDonald v. Pa. Dept. of Public Welfare*, 62 F.3d 92, 96 (3rd Cir.1995) (holding that, due to the limited duration of her incapacity, plaintiff who was unable to work for two months following surgery was not disabled within the meaning of the ADA); *Sanders v. Arneson Products, Inc.*, 91 F.3d 1351, 1354 (9th Cir.1996) (plaintiff whose psychiatric condition lasted for a four-month period was not disabled within the meaning of the ADA because of the temporary nature of his condition); *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 115 F.Supp.2d 127, 132 (D.Mass.2000), *aff'd*, 258 F.3d 30 (1st Cir.2001) (ruling that a plaintiff with "mild and reversible" cognitive deficits, who had presented "no evidence of any significant long-term impact" of her impairments, was not disabled within the meaning of state or federal law).

As with the plaintiff in *Whitney*, Bryant has failed to adduce sufficient evidence to demonstrate that the potentially disabling dimension to her eye condition is other than a "[t]emporary, non-chronic impairment[ ] of short duration, with little or no long-term of permanent impact." *Whitney*, 115 F.Supp.2d at 132. Indeed, the most recent communication from Bryant's treating physician, Dr. Sharuk, suggests just such a non-ADA-qualifying condition. Based on this evidence and Bryant's own testimony about her condition, I find that Bryant has not met the "permanent and long term" duration requirement set forth in *Toyota*. *Id.* at 198, 122 S.Ct. 681.

I turn now to the issue of the severity of the impact on Bryant of her eye condition. The only activities Bryant reports as having a current limitation in performance—"heavy lifting" and nighttime driving—do not constitute "major life activities" within the meaning of the ADA. "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Toyota*, 534 U.S. at 200–01, 122 S.Ct. 681. The record demonstrates that Bryant is able to engage in the "variety of tasks central to most people's daily lives." *Id.* She bathes and dresses herself, purchases and prepares her own food, participates in commerce, maintains her home, and takes care of her multiple pets. Notably, in addition to caring for herself as described, during the time period in question Bryant also has assumed primary care-taking responsibilities both for her elderly, infirm grandmother and for the young child of a good friend.

That Bryant has difficulty with heavy lifting and nighttime driving cannot overwhelm this record of high-level, independent functioning to yield a finding that she is "substantially limited" in "major life activities." *See Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir.1997) ("a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA"); *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 539–40 (9th Cir., 1997) (holding that employee's inability to lift twenty-five pounds on a continuous ba-

sis, more than fifty pounds twice a day, and more than one-hundred pounds once a day was not "substantially limiting" within the meaning of the ADA); *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir.1996) (holding, as a matter of law, that "a twenty-five pound lifting limitation—particularly when compared to an average person's abilities—does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996) (same); *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996) (finding that claimant who could "lift and reach as long as he avoids heavy lifting" was limited with respect to discrete tasks but was not "substantially limited in a major life activity"); *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 23 (1st Cir.2002) (noting in dicta that "if a restriction on heavy lifting were considered a substantial limitation on a major life activity, then the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape. Congress obviously did not mean to extend the protections of the ADA to every physical impairment that precluded the performance of some particularly difficult manual task."); *Soler v. Tyco Electronics, Inc.,* 268 F.Supp.2d 97, 107 (D.P.R.2003) (holding that where an individual could "clean his dishes, clean the yard, bathe his dog, do the groceries, take out the garbage, and prepare his own meals" his impairment "has not substantially limited the major life activity of lifting"); *Ortiz–Molina v. MAI Del Caribe, Inc.,* 83 F.Supp.2d 271, 277 (D.P.R.2000) (finding that "for a lifting limit to constitute disability under the ADA, it must be a severe, permanent restriction that *substantially limits the employee/plaintiff's ability 'to lift and reach'*

*in general "*) (emphasis in original) (internal citations omitted); *Chenoweth v. Hillsborough Cty.,* 250 F.3d 1328, 1329–30 (11th Cir.2001) (in finding that inability to drive to work for six months did not constitute an impairment substantially limiting a major life activity under the ADA, noting that driving was "conspicuously different in character" from the examples of "major life activities" enumerated in the EEOC regulations interpreting the ADA); *Colwell v. Suffolk Cty. Police Dept.,* 158 F.3d 635, 643 (2nd Cir.1998) (holding that driving, in and of itself, was not a major life activity within the meaning of the ADA).

The evidence adduced by Bryant has not demonstrated that the restrictions on her activities due to her medical condition are of sufficient duration and severity to constitute a "disability" under the ADA. Thus, she has not raised a genuine issue of material fact concerning the question of whether she is "disabled" within the meaning of, and therefore entitled to the protections of, the ADA.

■ b. *"Qualified "*—Had Bryant's failure to establish that she is "disabled" within the meaning of the ADA not sounded the death knell for her failure to accommodate claim against Caritas, which it does, her failure to prove that she is a "qualified individual with a disability" would. The ADA defines a "qualified individual with a disability," the members of the class it protects, as "an individual with a disability who, *with or without reasonable accommodation,* can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Bryant has not established that she could perform the "essential functions" of her job either with the requested accommodation or without it.

The "essential functions" analysis must be made on a case-by-case basis, as it involves "fact-sensitive considerations." *Gillen,* 283 F.3d at 25. In defining the "essential functions" of a job, the ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). As the First Circuit noted in *Ward v. Mass. Health Res. Inst., Inc.,* 209 F.3d 29 (1st Cir.2000), however, while courts "generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus,"[1] the employer's perspective "is only one factor in the analysis." *Id.* at 34; *see Gillen,* 283 F.3d at 25 ("the employer's good-faith view of what a job entails, though important, is not dispositive"). Even so, "since an ADA plaintiff ultimately must shoulder the burden of establishing that she was able to perform all 'essential functions' of her position, at summary judgment" the employee, not the employer, bears "the burden of adducing competent evidence from which a rational factfinder could have found in her favor." *Laurin v. The Providence Hosp.,* 150 F.3d 52, 59 (1st Cir.1998).

Caritas maintains, and Bryant does not dispute, that heavy lifting is required of a Staff Nurse in the Day Surgery department. In the course of a normal day, the necessary "heavy lifting" within a Staff Nurse's duties might include lifting patients, positioning and adjusting patients on stretchers or in recliners following their operations, pushing and pulling stretchers, moving patient belongings (the very activity that Bryant thinks caused further injury to her eye in February 2001), and retrieving supplies. In emergency situations, a Staff Nurse might also be required to catch a patient who was falling down or move a patient who had fallen. Bryant has presented no competent evidence to rebut the assertion by Caritas that "heavy lifting" is an "essential function" of a Staff Nurse in Day Surgery.

Nor has Bryant established, as is her burden, that she could perform "all essential functions" of her position, including the "heavy lifting" one, with or without a reasonable accommodation. *Id.* The record is quite clear that Bryant cannot perform "heavy lifting" *without* accommodation. Due to her medical condition, Bryant's doctors placed restrictions on her activities starting in February 2001, which included a prohibition on her engaging in "heavy lifting." Although some of the other conditions were later removed, the "heavy lifting" ban remained in effect as of June 2001 and was referred to as a "concern" in the final written communication from Bryant's treating physician, a September 25, 2001 letter. Bryant herself testified at her April 20, 2004 deposition that to that day she continued to have problems with "heavy lifting." It is apparent that Bryant could not engage in "heavy lifting" without an accommodation.

The question of whether Bryant could perform "all essential functions" of her job *with* a reasonable accommodation is, as it turns out, answered in the negative by the very accommodation sought by Bryant—exemption from "heavy lifting." In seeking as a reasonable accommodation of her alleged disability to be excused from one of the "essential functions" of her job, Bryant cannot meet the definition of a "qualified individual with a disability" necessary to receive protection under the ADA. Bryant was required to show that she could perform "*all* 'essential functions' " of her job with or without a reasonable accommodation. *Id.* (emphasis added). Caritas maintains, and Bryant does not rebut, that

---

1. Bryant has not alleged discriminatory animus on the part of Caritas with respect to defining the "essential functions" of the Staff Nurse position.

"heavy lifting" was one of the "essential functions" of her job as a Staff Nurse in the Day Surgery department. Pursuant to her doctor's instructions, Bryant could not perform "heavy lifting" without accommodation and therefore could not satisfy the statutory definition on this basis. Where the reasonable accommodation Bryant requested was to be exempted from all on-the-job "heavy lifting," she necessarily could not meet the statutory definition of a "qualified disabled individual" on the "with accommodation" basis.[2]

One final observation on this topic is in order. Because the "essential function" at issue implicated the safety of others—*i.e.*, the patients who needed to be lifted, positioned, or otherwise assisted via "heavy lifting" by Staff Nurses in the Day Surgery department—Bryant was required to "demonstrate that she can perform those functions in a manner that will not endanger others." *Gillen*, 283 F.3d at 24. In response to the expression of concern by Caritas regarding the implications for patient safety of the restrictions placed on her workplace activity, Bryant suggested that other nurses could perform this work for her. This suggestion does not satisfy the safety requirement set forth in *Gillen* and provides yet another reason why Bryant's claim fails.

### 2. *Violation of Statutory Duties—"Reasonable Accommodation"*

Having found that Bryant is not entitled to the statutory protections of the ADA

because she is not a "qualified individual with a disability" within the meaning of the law, I need not reach the question of whether Caritas provided her with a reasonable accommodation, because it was under no obligation to do so. For purposes of completeness, however, a concise analysis of this issue is provided.

The record evidence demonstrates that Bryant rejected repeated offers of a reasonable accommodation[3] by Caritas, refused to engage in an interactive process with Caritas to negotiate a reasonable accommodation, and insisted upon an accommodation that was not reasonable and would have imposed an undue hardship on Caritas. For each of these reasons, which are considered below, Caritas cannot be found liable to Bryant under the ADA for an alleged failure to reasonably accommodate her disability.

When a plaintiff employee rejects a reasonable accommodation offered by her employer, as Bryant did here, she is precluded from recovering under the ADA for her employer's alleged failure to provide a reasonable accommodation. *See, e.g., Phelps v. Optima Health, Inc.,* 251 F.3d 21, 28 (1st Cir.2001) (finding, where employee "turned down several job opportunities offered by [her employer] and placed significant conditions on her reassignment," that employer was not liable under ADA for failure of "interactive process" to generate an agreed-upon reason-

---

**2.** As discussed in II.B.2 below, Bryant's suggestion that Caritas provide another nurse to assist her with any "heavy lifting" that might arise in the course of her work was not a reasonable accommodation as that term is defined by the ADA. Accordingly, even considering the proposed revision to her initial request, Bryant has failed to establish that she is a "qualified disabled individual" who could perform all of the essential functions of her

job with or without a *reasonable* accommodation.

**3.** Specifically, Caritas offered Bryan reassignment to a position as a Scrub Nurse in the hospital's Ophthalmic Surgery department at the same pay and benefits as her prior position as a Staff Nurse in the Day Surgery department, with a stipulation that she could return to her previous position once cleared to do so by her physicians.

able accommodation); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir.1996) (holding that when employee demands a particular accommodation and employer offers some other reasonable accommodation, which employee rejects, employer cannot be found liable for failing to reasonably accommodate the employee); *Schmidt v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 342, 344–45 (7th Cir.1996) (holding that employee's rejection of reasonable accommodations offered by employer "render[ed] him unqualified under the ADA"); *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802 (6th Cir.1996) (holding that "plaintiff's refusal to accept available reasonable accommodations precludes her from arguing that other accommodations should also have been provided"); *Williams v. HealthReach Network*, No. Civ. 99–0030–B, 2000 WL 760742, at *12 (D.Me. Feb.22, 2000) (finding that employer could not be found liable under ADA because, among other reasons, plaintiff employee refused to accept various reasonable accommodations offered by employer).

■ Because, as was the case here, the particular accommodation sought by a disabled employee may not be reasonable, the ADA requires employers to offer *a* reasonable accommodation, not necessarily *the* accommodation sought. *See Quintiliani v. Mass. Bay. Transp. Auth.*, No. Civ. 98–11085–RGS, 2000 WL 1801841, at *6–7 (D.Mass. Nov.29, 2000) ("an employer does not have to choose the best accommodation available or the accommodation that the employee prefers ... [i]nstead, the employer has the 'ultimate discretion to choose between effective accommodations'") (quoting 29 C.F.R. § 1630.9, App.); *HealthReach*, 2000 WL 760742, at *12; *see also Gile*, 95 F.3d at 499; *Schmidt*, 89 F.3d at 344–45 (holding that "[r]easonable accommodation does not require an employer to provide literally ev-

erything the disabled employee requests"). To be sure, Caritas did not offer Bryant her accommodation of choice—a return to her position as a Staff Nurse in Day Surgery with a stipulation that she either not be required to engage in, or receive assistance with, heavy lifting—but by offering her an alternative position as a Scrub Nurse in Ophthalmic Surgery, it fully satisfied any duty it would have under the ADA were Bryant found to be entitled to reasonable accommodation under that statute.

■ Bryant erected further barriers to any potential recovery she might have under the ADA by failing to participate with Caritas in an "interactive process" to "determine the appropriate reasonable accommodation," as suggested by the interpretive guidance to the ADA promulgated by the EEOC. *See* 29 C.F.R. § 1630.2(*o*)(3). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Bryant and Caritas representatives discussed the possibility of her being reassigned to the Scrub Nurse position during two meetings at the hospital—the May 21, 2001 meeting held in anticipation of Bryant's planned return to work and the June 15, 2001 meeting convened after her attempted return. Thereafter, Bryant rejected a formal offer by Caritas that she be reassigned to the Scrub Nurse position, which was contained in an August 29, 2001 letter from Caritas Vice President for Human Resources Daniel Michaud to Bryant, and failed entirely to respond to the reiteration of this offer in a November 27, 2001 letter from counsel for Caritas. As a result of her silence in the face of these offers, Bryant effectively cut off any possibility of continuing an "interactive process" with Caritas regarding potential reasonable accommodations. Bryant, through

her own conduct, thereby precluded a finding that Caritas failed to reasonably accommodate her. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir.1997) ("Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide reasonable accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process."); *Rennie v. United Parcel Serv.,* 139 F.Supp.2d 159, 172–73 (D.Mass.2001) (plaintiff employee's "complete failure to continue to engage in the interactive process . . . prevented [her employer] from making further attempts to reasonably accommodate her" and precluded finding that employer failed to reasonable accommodate employee).

 As noted above, the ADA does not require an employer to grant its disabled employee's accommodation of choice, even if it is a reasonable one, and instead provides the employer with "the ultimate discretion to choose between effective accommodations." *See Quintiliani,* 2000 WL 1801841, at *6 (quoting 29 C.F.R. § 1630.9, App.). But in order to prevail on a failure to accommodate claim, an employee must demonstrate that her "requested accommodation is reasonable." *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir.2001). In *Reed,* the First Circuit set forth the burden on the plaintiff endeavoring to "prove 'reasonable accommodation'": "[A] plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Id.*

 Pursuant to the accommodation sought by Bryant, either Bryant would have been excused entirely from one of the essential components of the Staff Nurse position (*i.e.,* "heavy lifting") or Caritas would have been placed in the untenable position of having to assign another staff member to stand by Bryant's side, ready, willing, and able to assist her with heavy lifting should the need arise. Neither solution is a reasonable one and, singly or together, they fail the *Reed* test. Lifting, moving, and positioning patients—the sort of "heavy lifting" that Bryant's treating physicians had restricted her from participating in—are among the essential functions of a Staff Nurse in Day Surgery. While some of this sort of patient care is anticipated and can be planned for, some arises in the context of an emergency—for example, a patient falling out of bed and needing to be lifted up—that demands an immediate response from the staff on hand. Rather than showing that her proposed accommodation "would enable her to perform the essential functions of her job," Bryant has demanded exemption from one of those essential functions. The "exemption from heavy lifting" proposed accommodation clearly fails the first prong of the *Reed* test.

In response to this problem, Bryant suggested that Caritas provide a staff member to assist her with any "heavy lifting" that might arise in the course of her work. Because of the emergency situations referenced above for which "heavy lifting" might be necessary on a moment's notice, this back-up staff member would need to be at Bryant's side whenever she was providing direct care to patients or, at the very least, whenever she was the sole staff member in the room with patients. This modification, which itself fails the "feasibility" second prong of the *Reed* test, does not render the proposed accommodation reasonable and is not required under the ADA. *See EEOC v. Amego, Inc.,* 110 F.3d 135, 149 (1st Cir.1997) (citing with approv-

al *Ricks v. Xerox Corp.*, 877 F.Supp. 1468 (D.Kan.1995), which held that ADA did not require employer, as a reasonable accommodation, to hire full-time helper to assist disabled employee). Thus, Bryant has failed to establish the reasonableness of her proposed accommodation and, therefore, cannot recover against Caritas on her failure to accommodate claim.

█ Lastly, because Caritas has fully demonstrated that the accommodation requested by Bryant would impose an "undue hardship" on the hospital, the refusal by the hospital to grant it does not constitute prohibited discrimination under the ADA. *See* 42 U.S.C. § 12111(10). Pursuant to the interpretive regulations promulgated by the EEOC regarding the ADA, "[u]ndue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity." 29 C.F.R. § 1630.2(p)(1). In determining such "difficulty or expense," the factors to be considered include "[t]he impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties." 29 C.F.R. § 1630.2(p)(2)(v). Caritas has made an unrebutted showing that the accommodation requested by Bryant would require it to shift responsibility for an essential function of her job—any and all "heavy lifting"—to her co-workers. Shouldering this portion of Bryant's load would have a deleterious impact on the ability of her co-workers to do their own jobs.

In *Phelps v. Optima Health, Inc.*, 251 F.3d 21 (1st Cir.2001), the plaintiff contended that her former employer had failed to reasonably accommodate her in violation of the ADA by refusing to allow her to share patient-lifting duties with other nurses, as it had permitted in the past. In affirming the grant of summary judgment for the employer made by the dis-

trict court, the First Circuit held that "an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees." *Id.* at 26. Here, similarly, Caritas was not required under the ADA to shunt essential functions of Bryant's job to other employees, an approach that would have constituted an undue hardship not contemplated by the ADA.

### III. CONCLUSION

For the reasons set forth more fully above, Bryant has failed entirely to demonstrate any genuine issue of material fact either that she is qualified for the protections of the ADA or that Caritas has violated any obligations it might have to her under that statute. Consequently, the motion by Caritas for summary judgment is GRANTED.