SUPERIOR COURT 
 
 STEPHEN B. CORN, M.D. v. BRIGHAM AND WOMEN'S HOSPITAL & Others[1]

 
 Docket:
 1984CV00809
 
 
 Dates:
 May 11, 2023
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
 
 

      Plaintiff Stephen B. Corn, M.D. ("Dr. Corn" or the "Plaintiff') has brought claims against Defendants Brigham and Women's Hospital ("BWH"), Partners Healthcare System ("Partners"), and James Rathmell, M.D. ("Dr. Rathmell") (collectively the "Defendants") for alleged violations of G.L. c. 15 1B -disability discrimination (Count I), disparate impact (Count 1)[2], retaliation (Count III) and hostile work environment (Count IV) - and companion common law tort claims for contractual interference (Count V), interference with business relations (Count VI), fraudulent and negligent misrepresentation (Count VII), and quantum meruit (Count VIII). The Defendants have moved for summary judgment on all counts, arguing that the undisputed material facts of record demonstrate that Plaintiff has no viable claims and that they are entitled to judgment as a matter of law. For the reasons which follow, the Defendants' Motion for Summary Judgment shall be ALLOWED.

--------------------------------------------------------------

     [1]Partners Healthcare System and James Rathmell, M.D.

     [2]Plaintiff has since withdrawn his disparate impact claim. (Sec Pt.'s Opp. al 29.)

-1-

FACTUAL BACKGROUND[3]

     Partners is a hospital and physician network that includes BWH. Dr. Corn worked as an attending anesthesiologist at BWH beginning in 1991.[4] His duties included the clinical work of an anesthesiologist, specifically managing anesthesia for surgical. cases, either personally or by supervising residents, trainees and mid-level practitioners. Dr. Com also performed non-clinical duties, including research and educational activities.

     BWH is one of several teaching hospitals affiliated with Harvard Medical School ("HMS"). Physicians affiliated with BWH may provide instruction and training to residents, fellows, and medical students who train at BWH as part of their HMS education. BWH department chairs have discretion to recommend a physician, whom HMS may then appoint, to an academic position (typically for a five-year term and subject to reappointment). To be eligible for appointment and reappointment, a physician is expected to provide 50 hours of instruction to HMS-affiliated trainees annually, whether in clinical or classroom settings. HMS appointees do not receive a salary or other remuneration in connection with their academic positions. Additionally, an academic appointment at HMS is conditioned upon the physician's continued affiliation with BWH or some other I-IMS-affiliated hospital. After joining BWH; Dr. Com was recommended, appointed, and reappointed to a series of HMS academic positions viz.,

--------------------------------------------------------------

     [3] The within factual summary is drawn from the parties' Statements of facts and the supporting discovery materials referenced therein, with certain facts reserved for later discussion. These facts arc presented in the light most favorable to the Plaintiff, as Mass. R. Civ. P, 56 requires. Bulwer v. Mount Auburn Hosp.• 473 Mass. 672, 680 (2016). Notably, several of Plaintiffs Responses to Defendants' Statement of Facts fall to comply with Super. Ct. R. 9A, in that the purported denials and supporting citations do not address or refute the specific facts asserted. (See, Defs.' Statement of Facts at 8, 10-14, 19, 27, 36-37.} Those facts are deemed admitted. See Super. Ct. R. 9A(b}(5}(iii)(A}. The Court declines to rule on the Defendants' Motion to Strike Plaintiffs Statement of Additional Facts, because doing so is not necessary to resolve the Rule 56 Motion in Defendants' favor.

     [4] Plaintiff argues that he was an employee of13WH and its parent organization, Partners. Defendants maintain that Dr. Com was in fact employed by a separate entity, 13righam and Women's Physicians Organization. Regardless of whether BWH and/or Partners employed Plaintiff, these entities are in either event both entitled to summary judgment.

-2-

Instructor, Assistant Professor, and then Associate Professor. Additionally, in 2005, Dr. Charles Department's Director of Clinical Innovation. In this role, Dr. Corn organized didactic lectures and mentored junior faculty and residents.

     In 2006, Dr. Com notified BWH and Partners that he was suffering from severe gastrointestinal distress and irritable bowel syndrome. Dr. Com requested, as a job accommodation, that he not be required to work alone in the operating room ("OR"). Dr. Corn maintained that his medical condition might require him to use the bathroom suddenly and without warning, potentially leaving him unable to provide direct care to a patient under anesthesia. Dr. Sunil Eappen, the Department's then-Clinical Director, and Nurse Betty Bong, denied Dr. Com's request on October 17, 2006, informing him that anesthesiologists were required to work alone in the main OR at least five times per year to maintain their practice skills. BWH did, however, modify Dr. Corn's assignment schedule to provide closer access to bathroom facilities.

     Despite the denial of his particular accommodation request, Dr. Corn continued to work as an attending anesthesiologist from 2006 to 2011. Of note, Dr. Corn only worked alone in the OR on approximately seven occasions during this five-year period.[5] Dr. Corn contends that, by 2010, his condition had worsened due to stress from the Defendants' refusal to accommodate him, requiring that he use sick days and personal days to recuperate. Members of the Department's leadership and staff expressed frustration regarding Dr. Com's absences, and

--------------------------------------------------------------

     [5] In 2009, a colleague berated Dr. Com  in front of his peers when Dr, Com questioned a  last-minute schedule change requiring him to work solo in the OR, When Dr. Com questioned why his schedule had been altered at the last minute, Dr. Eappen responded that tho Department was concerned that if Dr. Com were scheduled to work solo in advance, he would not show up for work. Dr. Eappen also chastised Dr. Corn for his use of FMLA leave and personal days.

-3-

proposed a "betting pool" as to when he would return to work. Dr. Com, however, was not privy to these commW1ications in real time.

     In December, 2010, Dr. Com again requested that he not be required to work alone in the OR. In response, Dr. Vacanti agreed that Dr. Com would not be required to work as the sole anesthesiologist in the main OR.[6] However, Dr. Com suffered a "flare up" of his symptoms in April, 2011. At that time, Dr. Com requested that, in addition to never working alone in the OR, he be scheduled to work for one day following a flare-up in the post-anesthesia care unit or the pre-anesthesia testing clinic. This request prompted Dr. Vacanti to respond that BWH could no longer continue to accommodate Dr. Corn as it had been, and to suggest that Dr. Com instead apply for disability benefits. On July 6,201I, Dr. Com applied for, and was granted, long-term disability ("LTD") benefits. Dr. Com has received and will continue to receive LTD benefits, and BWH has (per policy) paid and will continue to pay Dr. Corn's retirement contributions and post-employment health insurance until he reaches age 65.

     Dr. Corn ceased performing any clinical work and stopped treating patients after April, 2011. Nonetheless, Dr. Vacanti permitted Dr.  Corn to retain his title as the Department's Director of Clinical Innovation, and recommended him for academic reappointment for another five-year term (2011-2016) as an Associate Professor of HMS (which reappointment Dr. Com received). Dr. Com's staff designation was thereupon changed from "Active Staff" to "Honorary

 --------------------------------------------------------------

     [6] Plaintiff has moved to strike as inadmissible hearsay a January 20,201 l letter in which Dr. Vacanti stated that BWH would provide the requested accommodation "for the most part (but not entirely)," including not requiring Dr. Com to work in alone in the main OR. The merits of Plaintiffs motion are dubious, as Plaintiff quoted the letter in his own Complaint, confirmed its contents during deposition, and does not contest its authenticity now. (See Compl.1 27; Ex. Rat pp. 223-25.) Further, the letter is plainly not hearsay. It is merely evidence of a verbal act or ''operative words," to wit, BWH's proposed accommodation to Dr. Com's medical condition. It is not offered as proof that BWH in fact subsequently met those terms. See Shimer v. Foley, Hoag & Eliot LLP, 59 Mass.
 App. Ct. 302, 309 (2003) (settlement offer admissible "precisely for the fact that the offer was made and far its terms"). Regardless, the Court need not consider the letter to decide in favor of the Defendants and, therefore, declines to rule formally on Plaintiffs Motion to Strike.

-4-

Staff." Honorary Staff arc "[f]ormer members of the Medical Staff" and "[o]ther distinguished professionals." (Defs.' Ex. C, BWH Bylaws, § 6.) Such staff enjoy no clinical or admitting privileges, and may not vote, hold office, or serve on BWH committees. (Id.). The designation, duration, and termination of any such honorary staff appointment lie within the sole discretion of the BWH department chair, and denial or termination of the title is not considered a form of disciplinary action. (Id.)

     Dr. Com maintains that, from 2011 to 2016, he continued to provide didactic lectures and mentor junior staff  members. I-le also completed  BWI-I's  annual  tuberculosis  testing and conflict of interest certifications, was listed on the BWI-I  and Partners  websites, enjoyed continued  use of his BWH and Partners email accounts,  had  access to  J-IIPAA-protected patient  information,  and had an assigned office and administrative assistant. In 2014, Dr. Com also moderated  a "grand rounds" lecture at BWH. A research  fund  of  $25,000  was additionally  endowed  to  the Department of Anesthesiology in Dr.  Com's  name,  and  Partners named  him  as  the  fund's principal investigator. However, there is no indication in the summary judgment record that, after April of 2011, Dr. Com had  any  regular  schedule  or any specific job requirements,  expectations, or functional obligations at BWH or Partners. Dr. Corn likewise received no salary or other compensation of any kind from I IMS, BWI-I, or  Partners related to his academic appointment,  to his title as Director of Clinical Innovation, or to any of  his other activities  after  he ceased performing clinical anesthesiology work at the hospital.

     In June, 2015, Defendant Dr. Rathmell became Chair of the Department of Anesthesiology and commenced meeting with its staff physicians. Dr. Rathmell did not seek a meeting with Dr. Com; but, at Dr. Com's request, the two of them met in January, 2016 to discuss Dr. Com's activities at BWH. Dr. Com alleges that he "brought up his health and

-5-

disability" at this meeting, but has not offered the Court further evidence as to the substance of the communication that took place. There is thus no indication that Dr. Corn requested an accommodation, or sought to resume working as either an attending anesthesiologist or in any other compensated capacity. Thereafter, Dr. Rathmell expressed to his counterpart al Boston Children's Hospital that Dr. Com "contribute[d] little or nothing to the department at this point, yet makes much use of his affiliation and HMS title when dealing with the outside world." On March 14, 2016, Dr. Rathmell notified Dr. Com that his HMS academic appointment would not be renewed after his current term concluded on October 30, 20I6, and that his appointment as "Honorary Medical Staff' would terminate that same day. Dr. Rathmell also requested that Dr. Com stop promoting himself with the title Director of Clinical Innovation in connection with the BWH Department of Anesthesiology.

     Dr. Corn filed an administrative complaint of discrimination with the Massachusetts Commission Against Discrimination (MCAD) on January 5, 2017, exactly 297 days after receiving Dr. Rathmell's letter. Plaintiff filed the present civil action on March 13, 2019.

STANDARD OF REVIEW

     "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Helfman v. Northeastern Univ., 485 Mass. 308, 314 (2020) (quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-19 (2010)). "The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue." Sholz v. Delp, 473 Mass. 242,249 (2015). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party's case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential clement of his case at trial. Flesner v. Technical Commc'ns Corp., 410

-6-

Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp.. 4 IO Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, "the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact." Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Grp., 469 Mass. 800,804 (2014). "Bare assertions made in the nonmoving party's opposition will not defeat a motion for summary judgment." Id. Accord Mass. R. Civ. P. 56(e) ("A party may not rest upon the mere allegations or denials of his pleading.").

DISCUSSION

I.   DISABILITY DISCRIMINATION (COUNT 1) AND RETALIATION (COUNT III)

     To establish a prima facie case of employment discrimination based on disability, a complainant must show that he was a "qualified handicapped person" capable of performing the essential functions of his job, either with or without a reasonable accommodation, and that he was subject to an adverse employment action because of his disability. Godfrey. 457 Mass. at 120; G.L. c. 151B,§ 4(16). The complainant must both file an administrative charge with the MCAD within 300 days of the alleged act of discrimination, and thereafter file suit in court within three years of such act. G.L. c. 151B, §§ 5, 9.

     The basic narrative of Plaintiff's disability discrimination and retaliation claims is that Dr. Corn first asked for a job accommodation to his medical condition in 2006. BWH denied this request, based on a cited policy that anesthesiologists work alone in the OR at least five times per year. Plaintiff renewed his request for this same accommodation in 2011.. BWH initially agreed, but then rescinded the accommodation when Plaintiffs symptoms "flared up." Thereafter, Plaintiff ceased to perform clinical work or receive compensation of any kind from the Defendants. In March, 2016, the Defendants withdrew Plaintiff's designation as an Honorary

-7-

Staff member and Director of Clinical Innovation, and declined to recommend him for another five-year academic appointment at HMS. Based on these allegations, Plaintiff argues that the Defendants failed to accommodate his disability, wrongfully terminated his employment, and retaliated against him in violation of G.L. c. 151B.
     Plaintiff filed the present action on March 13, 2019. Therefore, any claims based on events occurring prior to March 13, 2016 are time-barred; specifically, the BWH denials of Dr. Com's requests for accommodation, and the ensuing termination of his compensated employment in 2011.

     As to the actions that took place in 2016, the Court concludes  that  Plaintiff lacks standing to assert the claim in Count I (disability discrimination under G.L. c. 151B), because  Dr. Com did not have an employment relationship with any of the Defendants  after 2011.  Alternatively, Count I fails because Plaintiff was not a "qualified handicapped person" as of 2016. Lastly, the Defendants arc entitled to judgment on Counts I and  Ill  (retaliation), because  Plaintiff  did  not suffer an "adverse employment action" within the statutory limitations period.

     A. Timeliness of Claims Based on BWH/Partners'  Pre-2016 Actions

     A plaintiffs cause of action under G.L. c. 151B begins to run when he knows or  should have known that he was harmed by the employer's conduct. Silvestris v. Tanlasqua Regional Sch. Dist., 446 Mass. 756, 766 (2006). More specifically, the cause of action for handicap discrimination accrues when the plaintiff knew or should have known that his employer has refused to participate in the interactive process of determining a reasonable accommodation, or refused to make such an accommodation once one had been identified to it. Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 643-44 (2004). Herc, BWll / Partners denied Plaintiff's initial request for accommodation in 2006 and,

-8-

in 2011, withdrew the modified accommodation that had subsequently been extended to Dr. Com and instructed him to apply for LTD benefits. Dr. Com thereupon ceased working as an attending anesthesiologist (or in any other compensated capacity) at BWH. Thus, Plaintiff had actual or constructive notice by mid-201 I, at the latest, of his statutory claims for failure to accommodate and wrongful termination. Dr. Corn, however, did not file a complaint with either the MCAD or the Court until 2019, far outside the administrative and civil limitations periods.[7]

     Plaintiff argues that the Defendants engaged in a "continuing violation" culminating  in his "termination" in 2016, and, therefore, that his claims are not time-barred. The continuing violation doctrine is a limited exception to the statute of limitations, which "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Silvestris, 446 Mass. at 768-69, quoting Ocean Spray. 441 Mass. at 642. A continuing violation consists of repeated and related conduct - e.g., a hostile work environment - not separate and distinct acts of discrimination. Silvestris, 446 Mass. at 769. However, at least one identifiable incident must have occurred within the limitations period "to anchor the earlier claims" and "rewind[ ] the clock for each discriminatory episode along the way." Cuddver v. Stop & Shop Supermarket Co., 434 Mass. 521, 531-32 (2001). Plaintiff must also show that the timely discriminatory act was substantially related to the untimely acts, and that the untimely act(s) "did not trigger [an] awareness and duty to assert his rights." Ocean Spray, 441 Mass. at 643.

     Plaintiff in the case at bar cannot meet this burden because, as noted above, he had clear and unambiguous notice of(and ample cause to assert) his rights for an alleged failure to

--------------------------------------------------------------

     [7] The Court need not decide whether Dr. Com's 201 I request gave rise to "a separate claim of discrimination and ... a new statute of limitations," or merely sought reconsideration of BWH's prior decision in 2006, which would no/ reset the limitations clock. Sec Tobin v. Liberty Mut. Ins, Co., 553 P.3d 121, 131, 132 (1st Cir. 2009). Claims arising from the 201 l request for accommodation arc, in either event, quite untimely.

-9-

accommodate by 2011. Moreover, Dr. Rathmell's March, 2016 decision to terminate Plaintiffs titular designations·and not recommend Dr. Corn for academic_ reappointment at HMS was not
substantially related to 13WH's prior denials/withdrawal of Plaintiffs requested job accommodation. There is no evidence that Plaintiff ever requested an accommodation that would have allowed him to resume clinical work within Chapter 151B's limitations period. And Dr. Rathmell's administrative action relative to Dr. Com's non-working designations was "discrete, separate[,] ... [and] docs not draw other allegedly discriminatory acts into its scope, either prospectively or retrospectively." Everett v. 357 Corp.. 453 Mass. 585, 606-07 (2009). While such decision may have had "a continuing effect on plaintiffs life, it is not a continuing violation." Id. at 607, quoting DeFazio v. Delta Air Lines, Inc., 849 F. Supp. 98, 102 (D. Mass. 1994).

     Nearly two decades ago, the Supreme Judicial Court (SJC) rejected the very theory that each day an employer fails to accommodate an employee's condition constitutes a "continuing violation" or a new act of discrimination that restarts or extends the statute of limitations period. Ocean Spray. 441 Mass. at 643-45. The SJC reasoned that such an "each day" theory would render any discrete act of discrimination a continuing violation and, in effect, "eviscerate the purpose of a statutory limitations period and permit ... a limited exception ... to swallow it whole." Id. at 644-45. The same principle applies here. The record docs not reflect either an anchoring event or a continuing offense such as will bring Plaintiff's handicap discrimination claim within the limitations period. The Defendants' denial of Plaintiff's requested accommodation caused Dr. Corn to cease working as a clinical anesthesiologist in 2011, more than five years before Dr. Rathmell made the independent administrative decision to discontinue an entirely different set of non-working designations and appointments. These 2016 actions were

-10-

simply not part of a "continuing violation" as that principle has ever been applied by Massachusetts courts.

     Plaintiff alternately argues that his claims arc timely, because he did not learn until the pendency of this lawsuit that the purported five-day per year/work alone policy requirement at BWH was not applicable to him.[8] This argument falters both legally and factually. The statute of limitations on Plaintiffs handicap discrimination claim accrued when Dr. Corn knew or reasonably should have known that BWH would not accede to his request for accommodation, not when Plaintiff learned that the hospital's asserted justification for denying the·accommodation may have been erroneous. See Wheatley v. American Tel. & Tel. Co., 418 Mass. 394, 397-98 (1994) (holding discrimination cause of action arose when plaintiff received notice of the adverse action, not when he learned of the improper motive underlying it). Further, Plaintiff only worked alone on seven days between 2006 and 201I; and, in 2011, BWH agreed, at least temporarily, to accommodate Dr. Com by not requiring him to work solo in the OR. Thus, Plaintiff had actual or constructive knowledge by 2011 that BWI-1 could exempt him from any such five-day requirement, regardless of whether it was an applicable policy or a mere pretext for an improperly motivated denial. The limitations clock thus began to run when the Defendants discontinued this accommodation.

     Inasmuch as Plaintiffs claims based on a failure to accommodate or 2011 termination arc time-barred, all that remains of Counts I and III is Plaintiff's claim that the Defendants wrongfully terminated his "employment" in 2016 because of his disability and/or in retaliation for his requests for accommodation. These claims arc addressed below.

--------------------------------------------------------------

     [8] Defendants' responses lo discovery indicate that the policy requiring five days of solo work in the OR per year did not apply to general anesthesiologists, such as Dr. Corn, but instead only to members of the Obstetric Anesthesia Group.

-11-

     B. March. 2016 "Termination"

      1. Standing Under G.L. c. 151B (Count I)

     The Fair Employment Practices Act, G.L. c. 151B, was enacted "to provide remedies for employment discrimination, a practice viewed as harmful ... not only to the targeted individuals but the entire social fabric." Flagg v. AliMed, Inc., 466 Mass. 23, 28-29 (2013) (emphasis added). The statute reflects a recognition that "employees, who generally depend on their jobs for their livelihood, [may] need  greater  protection"  from  discrimination, harassment, and retaliation. Lowery v. Klemm, 446 Mass. 572, 581 (2006). The statute's disability discrimination provisions, in particular, seek lo allow "a handicapped individual ... to enjoy equal terms,  conditions and benefits of employment." Ocean Spray. 441 Mass. at 648 (emphasis _ in original). Thus, elementally, "[a] legal claim of employment discrimination requires employment," Brown v. Bank of Am.• N.A., 5 F. Supp. 3d 121, 129 (D. Me. 2014), and Chapter 151B confers no standing for bias claims "brought by or against someone outside the employment unit." Thomas O'Connor Constructors, Inc. v. Massachusetts Comm'n Against Discrimination, 72 Mass. App. Ct. 549, 555-56 (2008). Sec also Harvard L. Sch. Coal. For C.R. v. President & Fellows of Harvard Coll., 413 Mass. 66, 69 (1992) ("It is clear from the statute and case law that an individual has to be within the employment relationship.").

     Here, the record is clear that Plaintiff s employment at BWH ended in 2011, when he ceased practicing as a clinical anesthesiologist. Thereafter, Plaintiff enjoyed access to an office and other facilities at the hospital, retained nominal titles, and was, at least theoretically, available to provide mentoring or instruction to BWH staff members and HMS students in an

-12-

emeritus-style role. Regardless of how it might be characterized, however, this relationship was undeniably not employment. The core indicium of employment is the commitment to provide services in exchange for remuneration. Sec Black's Law Dictionary: (11th Ed. 2019) (defining "Employment" as "[t]he condition of having a paying job" or "[w]ork for which one has been hired and is being paid by an employer").[9] Here, by contrast, there is no evidence that Plaintiff was required or expected to perform any work or services for BWH or Partners after April, 2011, or that Dr. Corn ever anticipated or received any compensation in return for doing the very limited things he did do. At most, Plaintiff was a former employee, with whom BWH and Partners were free to associate and from whom they were equally free to disassociate outside the strictures of Chapter 151B.

     Plaintiff has not cited any precedent to suggest that Chapter 151B was intended to or should apply to the uncompensated, unstructured, and essentially Potemkin affiliation that existed between Dr. Corn and BWH Partners after 2011. Indeed, the available caselaw is to the contrary. Sec Lowery. 446 Mass. at 581 (workplace anti-harassment statutes, including G.L. c. 151B, do not apply to volunteers); Harvard, 413 Mass. at 69 (law students lack standing under G.L. c. l51B); Corney. 387 Mass. at 15-16 (G.L. c. 151B does not apply to independent contractors). Sec also McKnight v. General Motors Com.. 550 F.3d 519, 526-28 (6th Cir. 2008) (reaffirming majority position that former employees alleging post-employment discrimination lack standing under ADA Title 1).[10] The titles that the Defendants withdrew from Dr. Corn in

--------------------------------------------------------------

     [9] "In the absence of any indication to the contrary, we will not assume that the Legislature intended to cover relationships outside the traditional common law employer-employee relationship." Corney v. Hill, 387 Mass. 11, 15 (1982) (internal quotation omitted). See also Lowery v. Klemm, 63 Mass. App. Ct. 307, 311 (2005) rev'd on other grounds, 446 Mass. 572,supra (traditional, common law standard of an employment relationship is "the quid pro quo of compensation for work"),

     [10] Even under the decidedly minority position, Plaintiffs alleged "termination" in 2016 docs not fall within the narrow scope of claims available to former employees. The titles at issue here were not "fringe benefits," such as disability benefits, which typically arc only triggered when the employee is no longer able to work. Sec Iwats v. Intel Corp., 349 f. Supp. 2d 135, 147 (D. Mass. 2004) (distinguishing disability benefits from the usual cases of hiring, firing, promotion, reinstatement, etc,, in which a plaintiff must be a qualified individual with a disability at the time of the adverse action). Indeed, it bears repeating that BWH/Partners has provided and will continue to provide these very post-employment benefits to Dr. Corn.

-13-

2016 were, quite simply, not terms, privileges or conditions of an ongoing employment relationship. That relationship had ended in every substantive sense long ago. See Peterson v. Johnson, No. 2:22-CV-00276, 2023 WL 2586396, at *4 (S.D. Ohio Mar. 21, 2023) (holding plaintiff's title as "professor emeritus" was not an employment privilege, because "[h]is employment relationship with the University ended [when he retired]"). For this reason, and as a matter of standing, G.L. c. 1518 is inapplicable to the Defendants'  actions in 2016, and Plaintiff's claims in Count I of the Complaint fail as a matter of law.

2. Qualified Handicapped Person (Count I)

     Even if Plaintiff's post-2011 relationship with BWH/Partners somehow fell within the purview of Chapter 1518, Count I fails because Dr. Com has not established that he was a "qualified handicapped person" as of 2016. A "qualified handicapped person" is one "who is capable of performing the essential functions of a particular job, or who would be capable ... with reasonable accommodation to his handicap." G.L. c. 151B, § 1(16). Plaintiff must thus show that, either with or without reasonable accommodation, he was "able to perform the essential functions of employment at the time" of the discriminatory act. McKnight, 550 F.3d at 526, quoting Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1112 (9th Cir. 2000).

     In the present case, there is no indication that, as of 2016, Dr. Com requested an accommodation or otherwise sought to return to work as a practicing anesthesiologist (the "particular job" he held with the Defendants).11 Plaintiff's claims instead rest exclusively on the

--------------------------------------------------------------

     [11] Dr. Com cannot establish that he was a "qualified handicapped person" in 2016 by claiming that he could have performed the essential functions of an anesthesiologist with the accommodations he requested in 2011, As set forth ante in Section A(l), any such claim premised on Dr. Com's failure to receive the accommodations he requested in 2011 is time-barred.

-14-

loss of his titles as Director of Clinical Innovation and Honorary Staff member, and on the failure of BWH to recommend him for reappointment to an academic position at HMS. None of these privations, however, affected an essential feature or function of an attending anesthesiologist (sec ante) or any other position of employment at BWH; nor do any of these titles qualify as "a particular job" under the statute. [12] The Director and Honorary Staff member positions at BWH did not carry either compensation or any delineated responsibilities, expectations, or requirements. The HMS academic appointment was likewise entirely uncompensated. These honorific and academic designations arc elective, conditioned upon the physician's ongoing affiliation with BWH, and appear, in essence, to recognize that certain doctors (including retired and otherwise inactive ones) can provide beneficial instruction and mentoring to junior staff and students incident to their relationship with a teaching hospital. These facts do not, however, establish that Dr. Corn was a "qualified handicapped person" capable of"performing the essential functions of a particular job" at BWH (emphasis added) in 2016. The record makes clear that he was not.

     Because Plaintiff was not a "qualified handicapped person" at the time of any adverse job action !hat occurred within Chapter 151B's statute of limitations, the Defendants are entitled to summary judgment on Count I of the Complaint.

     3. Adverse Employment Action (Counts I and III)

     Plaintiffs claim in Count I also fails, as docs his claim in Count III (retaliation), because Dr. Corn has not shown that the Defendants' actions in 2016 (singly or together) constituted a

--------------------------------------------------------------

     [12] A "job" is not defined in Chapter 151B itself, and the term should thus be given effect consistent with its plain meaning in context. Boss v. Leverett, 484 Mass. 553, 557 (2020). A "job," reasonably construed, is "a regular remunerative position," Merriam Webster's Collegiate Dictionary, (11th ed. 2020) (emphasis added), "[a] regular activity performed in exchange for payment, especially as one's trade, occupation, or profession," or ''[a] position of employment." American Heritage Dictionary (5th ed. 2011) (emphasis added).

-15-

materially adverse employment action. A claim of employment discrimination or retaliation requires a showing that the plaintiff has been subjected to some adverse action that "materially ... affected the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." Douglas v. Donovan, 559 F.3d 549,552 (D.C. Cir. 2009) (emphasis added). Accord King v: Boston, 71 Mass. App. Ct. 460, 468-69 (2008). The "disadvantage must be objectively apparent to a reasonable person in the [plaintiff's] position; subjective feelings of disappointment and disillusionment will not suffice." Yee v. Massachusetts State Police, 481 Mass. 290,297 (2019) (internal quotation omitted). As to a retaliation claim, an employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Colon-Fontanez v. San Juan, 660 F.3d 17, 36 (I st Cir. 2011), quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

     In most instances, an adverse employment action "inflicts direct economic harm." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 762 (1998). Sec also Noviello v. Boston. 398 F.Jd 76, 88 (1st Cir. 2005)(noting that an adverse employment action is "[t]ypically ... a discrete change ... say, a discharge, demotion, or reduction in pay[.]"). Otherwise, the action must have some tangible impact on a "material feature" of the plaintiffs employment, King. 71 Mass. App. Ct. at 470, or "career advancement opportunities." Trachtenberg v. Department of Educ. of City of New York. 937 F. Supp. 2d 460,468 (S.D.N.Y. 2013). Cf. Martin v. District of Columbia, 78 F. Supp. 3d 279. 306 (D.D.C. 2015) (genuine issue as to adverse action where employee volunteered for duties that were a "stepping stone" for promotion). Conversely, the loss of an honorary position or the non-receipt of a discretionary award is considered insufficient to constitute an actionably adverse job action, absent some tangible impact on the plaintiff's

-16-

employment prospects. Sec, .Douglas, 559 F.3d at 553 (failure to nominate employee for award not materially adverse); Zelnik v. Fashion Inst. of Tech•• 464 F.3d 217, 229 (2d Cir. 2006) (failure to grant honorary title not adverse personnel action); Harrington v. Harris, 118 F.3d 359, 366 (5th Cir. 1997) (refusal to award discretionary  bonus not material adverse action); Barron v. Charleston Cnty. Sch. Dist., No. 205CV2463, 2006 WL 2092594, at *12 (D.S.C. July 26, 2006) (removal of teacher as honorary chairperson of graduation ceremony). Sec also Spring v. Sheboygan Arca School Dist., 865 F.2d 883, 886 (7th Cir. 1989) (employee's feeling of"public humiliation" held insufficient, as "public perceptions were not a term or condition of[ ] employment").

     In Zelnik, the Court of Appeals for the Second Circuit held that the defendant's refusal to confer "Professor Emeritus" status upon the plaintiff was not an adverse employment action, as there was no evidence that such status was anything more than honorific or that it entitled plaintiff to anything of value beyond that afforded to other retired faculty members. 464 F.3d at 227. The Court reasoned that while the title may have carried "intangible value, such as prestige, status, and respect within the [institution] and wider academic community," the plaintiff had "failed to adduce any evidence of such matters beyond his conclusory statements." Id. at 228. Further, the criteria for emeritus status were "vague, imprecise, ... highly discretionary [and] standardless[,]" and "necessarily entail[ed] subjective determinations" that did "not permit th[e] Court to ascertain or quantify the likelihood of an award." Id. Thus, it was unlikely "that an individual of ordinary firmness would be deterred or dissuaded from exercising his [] rights if threatened with the withholding of this purely honorific title." Id. See also Peterson, WL 2586396, at *4 (university's decision to withdraw "professor emeritus" status from retired department chair was not "a material change," as it "did not alter his legal or contractual

-17-

relationship with [the university] in any way"; the title was "honorific," "given discretionarily," and plaintiff "was retired ... before [it was revoked] and he remained retired after").

     Here, the job actions at issue arc Dr. Rathmell's decisions to withdraw Plaintiff's titles as Director of Clinical Innovation and Honorary Staff Member, remove Dr. Com from the BWH staff directory, and decline to recommend Dr. Com for further academic sinecures at-HMS. The criteria for such titles and appointments arc, like those in Zelnik and Peterson. vague, discretionary, and untethered to any contemporaneous or future employment opportunities. The Director of Clinical Innovation position is undefined in the record. apart from its incumbent providing occasional lectures and mentoring to junior staff. Likewise, the "Honorary Staff" moniker represents a designation bestowed entirely at the discretion of the department chair. As to the HMS academic positions, appointees are entirely uncompensated. Additionally, a physician's eligibility for honorary appointment/reappointment was predicated on 50 hours of "teaching" -very loosely defined- and a recommendation of the department chair based on the physician's "ongoing contributions to. the department and the institution," a vague and standardless criterion echoing those in Zelnik. (See Defs.' Ex. Z, Dep. of BWH and Partners (Rathmell) at p. 81:14-21.)

     In short, Plaintiff has "offered no objective evidence that he ha[s] been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment." MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996). Plaintiff has and will continue to receive post-employment LTO, health insurance, and retirement benefits through age 65, regardless. Although theoretically possible, the record docs not reflect any tangible harm to Plaintiff's future employment prospects; nor has Plaintiff explained how any such assertion would be consistent with his longstanding pursuit and receipt of LTD benefits rather than seeking new employment.

-18-

See Cleveland v. Policy Mgmt. Sys. Corp.• 526 U.S. 795,802,806 (1999) (plaintiff"must proffer sufficient explanation" for the "apparent contradiction" between his disability discrimination claim and his application for benefits attesting that he is "too disabled to work").[13] Significantly, Plaintiff was reappointed to an academic position with HMS after he last sought an accommodation in 2011, and the actions now at issue occurred only when that non-working appointment expired five years later. Although there is some evidence that other physicians continued to receive annual academic appointments after retiring from active clinical work, the Court cannot conclude from this record that Dr. Corn had any reasonable expectation of being reappointed  indefinitely after he ceased practicing as a clinical anesthesiologist. Nor can the Court conclude that lack of reappointment to a largely honorific title five years later would dissuade a person of reasonable fortitude from engaging in protected activity. In short, the record does not reflect that the Defendants materially changed any of the terms, conditions, or privileges of Dr. Com's employment after 2011. The record instead shows that the Defendants declined to perpetuate for this former clinician non-working titles that were, as of 2016, gratuitous, honorary, and vestigial. Dr. Com's personal disappointment over the end of his affiliation with BWH and Partners is, of course, acknowledged; but what occurred in 2016 was simply not an adverse employment action within the reach of Chapter 151B. Plaintiffs claims in Counts land III of the Complaint, therefore, will not lie.

     All that being said, ii is worth stepping back to lake a broader view of the legal

--------------------------------------------------------------

     [13]The present case is thus distinguishable from Pardo v. Genera) Hosp. Corp.. in which the plaintiff alleged that HMS violated G.L. e. 151B when ii refused to promote him to Assistant Professor. No. 982174, 2001 WL 1772030, * I (Mass. Super. Nov. 6, 2001) (Gershengom, J.). There, the Court denied summary judgment to HMS because Pardo presented evidence that he was a salaried employee of HMS, and the lack of promotion negatively impacted his voting rights, salary schedule, and prospects for future promotion and pay increases. Id. While the present case also involves an academic position at HMS, Plaintiff was not a compensated employee in 2016 and has not produced any evidence that the refusal to reappoint him adversely affected either his then-present or future prospects for compensation.

-19-

landscape. The essential purpose of the disability discrimination provisions of G.L. c. 151B, and the cognate protections of the federal Americans with Disabilities Act, is to provide individuals with disabilities who are willing and able to work with "a meaningful opportunity to participate in the employment marketplace," and to ensure that such individuals are not denied this opportunity by employers who harbor biases against them on account of their medical condition. Bryant v. Caritas Norwood Hosp.• 345 F. Supp. 2d 155. 162 (D. Mass. 2004). See also Mammone v. President & Fellows of Harvard Coll., 446 Mass. 657, 687 (2006) (Greaney, J., dissenting) ("a fundamental purpose of G.L. c. 15113 [is] to preserve the employment status of the handicapped"), citing Dahill v. Police Dep't of Boston, 434 Mass. 233, 240-41 (2001). The laws arc thus designed to promote workplace functionality and fairness -- both by prohibiting discrimination, and by removing artificial barriers which prevent qualified individuals with disabilities from enjoying equal employment opportunity. Bryant, 345 F. Supp. 2d at 162. quoting 29 C.F.R. Pt. 1630, App. (2004).

     That is undeniably not what occurred in the case at bar. At least as of 2011, Dr. Corn was not an individual who was willing and able to work functionally in a physician job that BWH needed to be performed; and just as clearly, BWH was not unfairly denying employment opportunities to Dr. Corn based on biases about his medical condition. In point of fact, Dr. Corn's claims in this case turn the salutary aspirations of Chapter 151B on their head, weaponizing the handicap discrimination laws lo try to force BWH to retain him in a non-functional capacity. By such claims, Dr. Corn seeks to preserve for himself the trappings but not the responsibilities of work, the very opposite of the handicap discrimination rights paradigm. The Legislature could not plausibly have intended Chapter 15lB to apply to circumstances where, as here, the plaintiff was not employed, was not pursuing employment, and was not

-20-

deprived of any material terms or conditions of employment during the statutory limitations period. For each of these independently sufficient reasons, summary judgment shall enter for the Defendants on Counts I and III of the Complaint.

II. HOSTILE WORK ENVIRONMENT (COUNT IV)

     The Defendants arc also entitled to summary judgment on Plaintiffs claim of a hostile work environment. "A hostile work environment is one that is pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [ ] that poses a formidable barrier to the full participation of an individual in the workplace." Cuddyer, 434 Mass. at 532 (quotation omitted). "Simple teasing, of hand comments, and isolated incidents (unless extremely serious) will not ... establish an objectively hostile or abusive work environment." Colon-Fontanez, 660 F.3d at 44 (internal quotation omitted). See Noviello, 398 F.3d at 92 ("[R]udeness or ostracism, standing alone, usually is not enough . . .").Sec also King, 71 Mass. App. Ct. at 469 ("Work places are rarely idyllic retreats[.]"). "[S]ummary judgment is an appropriate vehicle for policing the baseline for such claims," Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006), and "distinguish[ing] between the ordinary, if occasionally  unpleasant, vicissitudes of the workplace and actual harassment." Noviello, 398 F.3d at 92.

     In addition to the denials of his requests for accommodation, Plaintiff asserts that co- workers occasionally made demeaning comments to him about his work schedule and bathroom use. The only comments Plaintiff alleges with any specificity, however, am his 2009 argument with Dr. Eappen and another colleague about working alone in the OR, and the 2010-2011 communications among the Department leadership disparaging his absences - which Plaintiff asserts were only necessary because BWH/Partners was failing to accommodate him. (Sec Pl.'s Statement of Facts, at ¶¶26-29, 41.)

-21-

     A hostile work environment claim so conceived fails for each of two reasons. First, Plaintiff has not identified any more recent anchoring event to bring his claim within Chapter 151B's limitations period. See Cuddyer, 434 Mass. at 533. The asserted allegations dating to the 2009-2011 period are untimely, and cannot sustain a viable harassment claim asserted many years later. Second, while the BWH leadership's disparaging comments about Dr. Com may indicate some degree of disability animus, Plaintiff only learned of such comments during discove1y. (Sec Pl.'s Opp. at 23 (emphasis added).) A hostile work environment claim concerns discriminatory conduct that "unreasonably interferes with an employee's work performance." Harris v. Forklift Systems Inc., 510 U.S. 17, 21 (1993). It is not a vehicle for retroactively policing and punishing comments that co-workers make behind each other's backs. There can be no rational basis upon which to conclude that Dr. Corn's work performance was impacted by comments of which he was then unaware. Plaintiff's conclusory allegations that the workplace environment was "terrible," or that he was "ostracized" by his peers, are likewise insufficient to defeat summary judgment. The record reveals only isolated and temporally remote (pre-2011) conflicts concerning Dr. Com's professed inability to work alone in the OR. The Defendants' alleged conduct post-2011 appears entirely un9xccptional, and consistent with the fact that Dr. Com was no longer working as a paid anesthesiologist at BWH. The record simply does not reveal "a prolonged and compelling pattern of mistreatment that ... forced [Plaintiff] to work under intolerable [ ] conditions." Cuddyer, 434 Mass. at 533. Sec also Col6n-Fontanez, 660 F.3d at 44 (holding evidence that a supervisor regularly refused to meet with plaintiff, yelled at her, failed to act to prevent or deter other employees from making derogatory comments, and limited her movements, inter alia, was insufficient to defeat summary judgment); Ponte v. Steelcase, Inc., 741 F.3d 310,320 (1st Cir: 2014) (anti-discrimination laws do not serve as a "general

-22-

civility code" for the workplace).

     As Plaintiffs hostile environment claim in Count IV of the Complaint is neither timely nor supported by the evidentiary record, the Defendants are entitled to summary judgment as a matter of law.

III. TORTIOUS INTERFERENCE WITH BUSINESS AND CONTRACTUAL RELATIONS
(COUNTS V AND VI)

     To prevail on a claim of tortious interference with contractual or advantageous business relations; a plaintiff must prove five elements: (1) that he had a contract or advantageous business relationship with a third party; (2) the defendant knew of the contract or relationship; (3) the defendant induced the third party to break the contract or terminate the relationship; (4) the defendant did so by improper means or motive; and (5) the plaintiff was damaged or lost the benefit of the contract or relationship as a result. Skyhook Wireless, Inc. v. Google Inc., No. 2010-3652, 2012 WL 5309755, at *13 (Mass. Super. Sept. 28, 2012) (Fabricant, J.), citing Draghetti v. Chmielewski, 416 Mass. 808,816 (1994).

     Plaintiff asserts in Counts V and VI of the Complaint that Dr. Rathmell's actions interfered with his relationships with HMS, Boston Children's Hospital, BWH, and the "anesthesia community locally." (Pl.'s Opp. at 29-30.) These allegations, however, will not defeat summary judgment. BWI-1 is not itself a cognizable third party. See Hunneman Real.Est. v. Norwood Realty, Inc., 54 Mass. App. Ct. 416, 425 (2002) (a party is generally not liable for interfering in its own affairs). Nor is the "anesthesia community." Katin v. National Real Est. Info. Servs., Inc., No. 07-10882, 2009 WL 929554, at *8 (D. Mass. Mar. 31, 2009) (unidentified members of the public or an industry do not constitute counterparties to an advantageous business relationship). By the same token, Plaintiff has not identified a contractual or economic relationship with any of the entities named that would give rise to a "reasonable expectancy of

-23-

financial benefit." Sec Sindi v. El-Moslimany. 896 F.3d I, 25 (1st Cir. 2018), quoting Owen v. Williams, 322 Mass. 356,362 (1948). Based on the summary judgment record, the full extent of Plaintiffs connection to Boston Children's Hospital is that he was also named a departmental Director of Clinical Innovation there. There is no indication that either such title or his academic positions with HMS carried any financial benefit or reasonable expectation thereof. Sec Blackstone v. Cashman, 448 Mass. 255, 259 (2007) ("The tort ... protects a plaintiffs present and future economic interests from wrongful interference." (emphasis added)).

      The Defendants are thus entitled to summary judgment on Counts V and VI of the
Complaint. 

IV. FRAUDULENT AND NEGLIGENT MISREPRESENTATION (COUNT VII)

      To recover for fraudulent misrepresentation, a plaintiff must prove that the defendant (1) made a false representation of a material fact with knowledge of its falsity for the purpose of. inducing the plaintiff to act thereon; (2) the plaintiff relied upon the representation; and (3) the plaintiff acted upon the representation to his damage. Masingill v. EMC Com., 449 Mass. 532, 540 (2007). Similarly, for. negligent misrepresentation, a plaintiff must prove that the defendant (I) in the course of his business; (2) supplied false information for the guidance of others; (3) in their business transactions; (4) causing and resulting in pecuniary loss to those others; (5) by their justifiable reliance upon the information; and (6) failed to exercise reasonable care in obtaining or communicating  tho information. Savers Prop. & Cas. Ins. Co. v. Admiral Ins. Agency, Inc., 61 Mass. App. Ct. 158, 169 (2004).

      Here, Plaintiff vaguely alleges that BWH and Partners led him "to believe that he was an employee of both from 2011 to 2016," and that "[i]f he was not such an employee, their representations [were] for the purpose of inducing him ... to provide them with his services."

-24-

(Pl.'s Opp. at 30.) Plaintiff also asserts that he turned down offers to join boards or other affiliations for pay, believing that they would create a conflict of interest with BWH or Partners. Regardless of whether various individuals at BWH or Partners colloquially indicated or implied that Plaintiff was an employee of these institutions from 2011 to 2016, there is no evidence this was done to induce any action on Plaintiff's part or caused any loss that is more than speculative. There is thus no indication that the Defendants were aware of any of Dr. Corn's purported opportunities or induced him to forego the same, through false representations or otherwise, Moreover, there is no evidence that the Defendants engaged in a "business transaction" with Dr. Com after 2011, falsely induced him to provide services, or communicated any reasonable basis upon which Plaintiff could expect to receive compensation or other remuneration for his altogether voluntary acts between 2011 and 2016.

      The Defendants arc entitled to summary judgment on Count VII of the Complaint.

V. QUANTUM MERUIT {COUNT VIII)

      A plaintiff seeking to recover under a quantum meruit theory must prove:"(!) that [he] conferred a measurable benefit upon the defendants; (2) that [he] reasonably expected compensation from the defendants; and (3) that the defendants accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation." Finard & Co., LLC v. SITT Asset Mgmt.•  79  Mass. App. Ct. 226,229 (2011). Although Plaintiffs actions after April, 2011 at least arguably conferred a benefit upon BWI-I and/or Partners, there is no evidence that Dr. Com expected payment in return or that the Defendants had any reason to believe he anticipated such compensation. The undisputed evidence is to the contrary. Thus, the Defendants are entitled to summary judgment on Count VIII of the Complaint.

-25-

CONCLUSION AND ORDER

      For all the foregoing reasons, the Defendants' Motion for Summary Judgment shall be, and hereby is, ALLOWED.

SO ORDERED.

/s/Robert B. Gordon
Justice of the Superior Court

May 11, 2023